NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0720n.06
Filed: November 20, 2008

**No. 07-3809**


**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**UNITED STATES OF AMERICA,**

    **Plaintiff-Appellee,**

**v.**

**LAWRENCE F. SMEAD,**

    **Defendant-Appellant.**

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO**

                                         /


**BEFORE:**    **CLAY, GILMAN, and ROGERS, Circuit Judges.**

    **CLAY, Circuit Judge.**   Defendant Lawrence F. Smead appeals his conviction for bank robbery under 18 U.S.C. § 2113(a). Following a *Daubert* hearing, the district court permitted Defendant's expert to testify about psychological studies related to factors that affect the reliability of eyewitness identifications, but excluded expert testimony regarding procedures that reduce errors in photo-array identifications. Defendant argues that the district court abused its discretion in excluding this testimony, and that the exclusion violated his constitutional right to present a complete defense. For the reasons that follow, we **AFFIRM**.

1

**BACKGROUND**

On November 9, 2006, a man robbed a U.S. Bank office located in a Giant Eagle grocery store in Tallmadge, Ohio. The man passed a note to the bank teller, Leah Morrow, demanding money and stating that he had a gun. Morrow complied with the robber's demands, and the robbery lasted less than one minute. Within a few hours, law enforcement arrived at the bank, and Morrow provided a written statement to the Tallmadge police department. FBI Agent Todd DeKatch also obtained a statement from Morrow regarding the robbery.

In her statements, Morrow indicated that the robber was a white male around the age of sixty-five, of medium height and build. She told authorities that he was wearing blue jeans, a "grey hoodie" pulled over his head, and a blue windbreaker on top of the hoodie. (J.A. 287.) Morrow also indicated she was "80 [percent] sure" that the robber was wearing fingerless gloves. (J.A. 287.) Neither her written statement to the Tallmadge authorities nor her statement to the FBI describes the robber's facial characteristics, such as the size of his nose, his eye color or shape, or his hair.[1] After further investigation, the FBI identified Defendant as a potential suspect. DeKatch then prepared a photo-array lineup that included Defendant's drivers' license picture along with five other drivers' license photographs retrieved from a law enforcement database. In selecting the photographs, DeKatch relied on Morrow's physical description of the robber as well as the physical characteristics indicated on Defendant's drivers' license. DeKatch also explained that he attempted to find men wearing collared shirts to match the clothing Defendant wore in his drivers' license picture.

---

[1]Morrow testified at trial, however, that she told Agent DeKatch during the initial interview that the robber had a "wrinklier face and a bigger nose." (J.A. 118.)

2

On November 30, 2006, DeKatch, along with two other FBI agents, arrived at the U.S. Bank office in Tallmadge and presented the photo-array lineup to Morrow. The lineup contained six pictures, three in each row. Prior to showing her the lineup, DeKatch told Morrow that he was going to "show [her] some photos" and that she should "take a quick look" to "see if [she] recognize[d] anybody. If not, okay; if he is there, okay." (J.A. 119.) DeKatch also stated that he and the other agents were "not sure if the gentleman who . . . robbed [her]" was depicted in any of the photographs. (J.A. 119.) Morrow, after first looking at four other photographs, identified Defendant as the person who robbed the bank on November 9, 2006. The next day, authorities arrested Defendant.

Following Defendant's arrest, the FBI continued to investigate the bank robbery. On December 8, 2006, DeKatch interviewed Marilyn Smead, Defendant's wife. Because Defendant moved out in October 2006, Defendant no longer lived with Ms. Smead. DeKatch informed Ms. Smead that he was an FBI agent, and that the FBI suspected Defendant of bank robbery. DeKatch showed Ms. Smead surveillance photographs from the time of the robbery. Even though the robber's face was not visible in the photographs, Ms. Smead told DeKatch that she recognized the individual in the photographs as her husband based on the clothing that the robber was wearing. She said that she recognized the robber's coat as the Nike coat that she had purchased for her husband. Ms. Smead also told DeKatch that Defendant owned a grey hooded sweatshirt from Old Navy similar to the one the robber wore in the photograph.

On December 19, 2006, the FBI received a phone call from Debra Golden, the employee in charge of car sales at Auto King. Golden told the FBI that, on November 9, 2006, the day of the bank robbery, Defendant purchased a van from Auto King. When Defendant defaulted on his

payments, Golden contacted Defendant's wife in an attempt to locate Defendant. When Golden spoke to Ms. Smead, Ms. Smead informed Golden that the FBI had taken Defendant into custody on charges of bank robbery. Golden then contacted the FBI. On December 19, 2006, DeKatch interviewed Golden. Golden informed DeKatch that, "about three days prior to" November 9, 2006, Defendant "picked out the van and told [Auto King] he was expecting some money to come in and he was going to come back once he got his money to get the van." (J.A. 93.) When asked to describe Defendant's appearance on the day he purchased the van, Golden could not remember the clothing Defendant was wearing.

On January 17, 2007, DeKatch returned to the dealership. DeKatch informed Golden that Defendant was a suspect in a bank robbery, and asked Golden to examine the surveillance photographs. After looking at the photographs, Golden told DeKatch she remembered that Defendant, on the day he purchased the van, wore a jacket with "a Nike sign hanging out from under it" similar to the one worn by the robber in the surveillance photographs. (J.A. 96.) At trial, she testified that, although she could not describe his clothing in her prior interview with DeKatch, "it all came back[] because of the Nike sign." (J.A. 103.)

Subsequently, the government issued an indictment against Defendant, charging him with armed bank robbery in violation of 18 U.S.C. § 2113(a). Defendant pled not guilty to the charges. Following his plea, Defendant filed a motion to suppress Morrow's identification from the photo-array lineup, arguing that it violated Defendant's due process rights because it was "unduly suggestive." The district court denied the motion, disagreeing that the lineup was impermissibly suggestive. The district court reasoned that all of the individuals in the lineup had "features . . . distinctive enough that one would remember them" if they had robbed a bank. (J.A. 53.) The court

also considered the five factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972), that this Court considers in determining whether an identification is reliable, and concluded that the photo-array lineup did not create a substantial likelihood of irreparable misidentification. Following the court's denial of his motion, Defendant filed a motion in limine to admit the expert testimony of Dr. Solomon Fulero "to provide the jury with an explanation of the psychological aspects of making eyewitness identification." (J.A. 22.)

On the first day of trial, the jury heard testimony from Morrow, Golden, DeKatch, and Ms. Smead. At trial, Morrow testified that she was "positive" the Defendant was the person who robbed the bank. In addition, she made an in-court identification of Defendant. She also testified that she "couldn't sleep for three days" following the robbery, and that she continually compared the face of the robber to other faces "to see if [she] could recognize him from anything else." (J.A. 143.)[2] Morrow further stated that she believed the robber had a gun, and that she was able to look at the robber's face for "seconds." She acknowledged, however, that certain details of her description of the robber were mistaken. For example, she was eighty percent sure he wore fingerless gloves, when he actually wore full gloves. In addition, the robber was not wearing blue jeans as she described; instead, he wore beige pants.

Because the government did not present any physical evidence tying Defendant to the bank robbery,[3] Morrow's eyewitness identification of Defendant from the photo-array lineup was a critical

---

[2]Morrow previously stated that she had a dream about the robbery a week following the incident. While she acknowledged this previous statement, she also told defense counsel on cross examination that "it wasn't necessarily a dream." (J.A. 143.)

[3]DeKatch testified that the FBI was unable to track any of the proceeds of the robbery, even though Morrow had given the robber "bait bills" which tellers intentionally give bank robbers to help law enforcement locate stolen funds. The FBI did not search Defendant's house to locate money. DeKatch also

aspect of the government's case. As a result, defense counsel extensively cross-examined both DeKatch and Morrow regarding the lineup. For example, defense counsel asked both individuals whether they believed the other photographs in the lineup depicted men who were better dressed or less "disheveled" in appearance than Defendant, or had more pleasant expressions. Defense counsel also questioned both witnesses regarding differences in the backgrounds of the pictures and the relative distance from which the photographs were taken. In addition, defense counsel challenged Morrow's later addition of "wrinkly skin" and a prominent nose to her description of the robber, and questioned her regarding the absence of those details in her initial statements to law enforcement.

Following the conclusion of the government's presentation, the district court conducted a hearing to consider Defendant's motion in limine to offer the expert testimony of Dr. Fulero. During the hearing, Dr. Fulero explained the content of the testimony he would present to the jury. First, Dr. Fulero described the "reconstructive theory of memory." Because the district court found that the theory was "well accepted and has been peer reviewed," the district court concluded that the theory was reliable. (J.A. 230.) The district court also found reliable the theory that the confidence in an identification does not correlate to its accuracy, noting that "all the literature and all the studies [show] a weak correlation between the confidence . . . and the accuracy of the identification." (J.A. 230.)[4] After evaluating reliability, the district court also found that these theories were "relevant for

_____

admitted that the FBI recovered only a grey sweatshirt from Ms. Smead's home. The FBI did not recover the Nike jacket at Defendant's home or in dumpsters outside of Giant Eagle. In addition, the FBI did not find any fingerprints on the counter of the bank. DeKatch acknowledged that there was "no evidence that [Defendant] actually possessed . . . clothing that was similar to the clothing depicted in the bank surveillance photographs." (J.A. 84.)

[4]In response to questioning during the *Daubert* hearing, Dr. Fulero made clear that "there is absolutely no doubt that the conclusions that I have drawn are the ones that are generally accepted." (J.A. 214.)

the jury to know . . . and consider . . ., along with all the other factors in deciding how much weight to give any particular witness . . ." (J.A. 230.) Thus, the district court concluded that the reconstructive theory of memory and the testimony regarding the weak correlation between a witness' confidence in an identification and the accuracy of that identification were admissible under Rule 702 of the Federal Rules of Evidence.

With respect to the testimony regarding procedures used to create and administer the photographic lineup, the judge was less sure. At the hearing, Dr. Fulero stated that, in previous trials, he had explained that scientific research demonstrates that procedures used to administer a photographic lineup can affect the accuracy of the identification.[5] The court agreed to allow defense counsel to "elicit testimony . . . that there is always a danger with any lineup that a witness has used a lineup to fill in a gap [in the original memory of the crime.]" (J.A. 231, 234). However, the district court excluded expert testimony as to "how this lineup could have led to a wrongful identification" (J.A. 233) because such testimony would "only [be] relevant [to argue that the jury] should give less weight to [Morrow's] testimony" (J.A. 235) and would "invad[e] the province of the jury." (J.A. 236.) The district judge further reasoned that, although counsel could argue that law enforcement could have done a better job selecting the lineup photographs, the jury did not need an expert to testify that the photographs themselves might have contained suggestive hints affecting the reliability of Morrow's identification.

---

[5]Dr. Fulero also indicated he would explain that "eyewitness evidence is only as good as the methods that are used to collect it." (J.A. 206.) For example, "sequential presentation, double blind presentation, the appropriate instructions, and the construction of the spread itself" are all techniques that can reduce the frequency of erroneous identifications. (J.A. 206.)

Following the hearing, Dr. Fulero testified. The government stipulated to Dr. Fulero's extensive credentials in the field of the psychology of eyewitness identification. Dr. Fulero detailed the basis of his research, and then explained the reconstructive theory of memory and the three distinct phases of memory. He emphasized that "information people get about an event after it happens can actually become part of their memory of the initial event." (J.A. 248.) Dr. Fulero also testified that, during the acquisition stage of memory, exposure time to a suspect's face can affect the accuracy of an eyewitness' memory. He then discussed detail salience, explaining that human attention "is geared toward things that somehow stand out" during complex events. (J.A. 252.) Dr. Fulero explained to the jury that if salient details such as a prominent nose or a wrinklier face are absent from initial descriptions but show up in later statements, post-event information might have affected the witness' memory of the initial event. In addition, if there is a salient feature in the photograph of the individual that a witness identified as the perpetrator, that salient feature could be "related back" to the original event.

Dr. Fulero also stated that the implied presence of a weapon can reduce the accuracy of an eyewitness identification. In addition, he testified that, even if an individual has special training to look for certain details to later be able to describe a perpetrator to law enforcement, those individuals are not better than untrained individuals at providing an accurate description or making an accurate identification.[6]

With respect to the retention stage of memory, Dr. Fulero explained that memory deteriorates quickly, and it is very important to obtain eyewitness evidence as close in time to the event as

---

[6]Morrow testified that, as a bank teller, she received security training regarding procedures to follow in the event of a bank robbery, which included instructions "to look for distinct features" so that the teller could later "give a good description" of the robber to law enforcement. (J.A. 117.)

8

possible. Dr. Fulero informed the jury that attempting to visualize a suspect can adversely affect the accuracy of a witness' later identification. In addition, he testified that "the manner in which a photo spread is constructed and administered has a lot to do with the ultimate accuracy of the identification." (J.A. 261.) When Dr. Fulero mentioned that there are "specific things that can be done to reduce error in photo spreads," the government objected, and Dr. Fulero was unable to discuss any of the procedures that affect the reliability of a photographic-lineup identification. (J.A. 263.)

Dr. Fulero concluded his testimony by explaining the low correlation between a witness' confidence in an identification and the accuracy of that identification. He also testified that, at the retrieval stage, which occurs when the witness makes an in-court identification, a witness could be identifying a face that is familiar from one place, such as a photo-array lineup, but not from another, such as the initial crime.

Following Dr. Fulero's testimony, the defense rested, and the district judge instructed the jury regarding the evaluation of expert testimony. The jury found Defendant guilty of bank robbery.

## DISCUSSION

### *Standard of Review*

Defendant argues that the district court abused its discretion in excluding a portion of Dr. Fulero's testimony, and that his inability to present this aspect of Dr. Fulero's testimony violated his constitutional right to present a complete defense.

This Court reviews a district court's evidentiary rulings, "including rulings on witness testimony under Rule[] . . . 702 of the Federal Rules of Evidence," for abuse of discretion. *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007). Even when a defendant argues that a district

9

court's decision violated his constitutional rights, "the abuse of discretion standard is not at odds with *de novo* interpretation of the Constitution" because a "district court does not have the discretion to rest its evidentiary decisions on incorrect interpretations of the Constitution." *United States v. Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006). In reviewing a decision for abuse of discretion, this Court will reverse the district court's decision "only where the district court renders a manifestly erroneous ruling." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293 (6th Cir. 2007) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)).

*Analysis*

The United States Constitution guarantees criminal defendants "a meaningful opportunity" to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks omitted). In the context of a criminal trial, an accused's right to present a defense derives from the Sixth Amendment. *Forensic v. Birkett*, 501 F.3d 469, 475 (6th Cir. 2007). A central component of a defendant's right to present a defense is the right to offer the testimony of witnesses. *Taylor v. Illinois*, 484 U.S. 400, 409 (1998). Because expert testimony often forms a critical part of a defendant's presentation of evidence, "[i]n rare instances," a district court's exclusion of testimony under Rule 702 might violate a defendant's Sixth Amendment right to present a defense. *United States v. Vasilakos*, 508 F.3d 401, 410 (6th Cir. 2007). A defendant's right to present a complete defense, however, "is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Forensic*, 501 F.3d at 475. Further, "federal rulemakers have broad latitude . . . to establish rules excluding evidence from criminal trials . . . . so long as [the rules] are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 482 U.S. 44, 56 (1987)). Thus, "well-

10

established rules of evidence [that] permit trial judges to exclude evidence" under certain circumstances are unlikely to violate a defendant's constitutional rights. *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006).

Federal Rule of Evidence 702 provides that, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," then "a witness qualified as an expert . . . may testify . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The Supreme Court has concluded that Rule 702 requires a district court, when presented with potential scientific expert testimony, "to determine whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Langan*, 263 F.3d 613, 620 (6th Cir. 2001) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). This Court has interpreted *Daubert* to require district courts to engage in a two-step inquiry. *United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000). A district court first must determine "'whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue.'" *Id.* (quoting *Daubert*, 509 U.S. at 592-93). In the second step, a district court should ensure that the "proposed expert testimony is relevant . . . and will serve to aid the trier of fact," and also determine whether the testimony "fit[s]." *Id.*

In conducting its hearing on Defendant's motion in limine, the district court focused on the second prong of the analysis for admissibility of expert testimony—whether the expert's "reasoning or methodology properly could be applied to the facts at issue to aid the trier of fact." *Smithers*, 212

11

F.3d at 315. To support the decision to exclude the expert's testimony regarding lineup procedures that increase the reliability of an eyewitness' identification, the district judge stated that he was "not going to allow expert testimony on the details of this particular lineup. I don't see anything—you have not shown me anything which shows that that kind of testimony is relevant and admissible, and I have not heard it from this witness." (J.A. 234.)

The court further stated:

> I'm not going to allow [an explanation of what science has shown about the manner in which photos are presented in a photo spread] because that . . . is only relevant so you can say well, because this [procedure] wasn't done, you should give less weight to this witness' testimony. . . . I don't think that's a permissible subject for expert testimony.
> . . . .
> I'm not going to allow testimony on general lineup procedures. I think we've had testimony about that. The parties can argue that. But I don't . . . find that that would be helpful, and I think that is invading the province of the jury, and tying a lot of general theories to a very specific procedure here.

(J.A. 235-36.) Finally, the district judge added a further explanation for his "ruling on the photo spread procedures." He stated:

> The issue about the photo spread in this case is the argument that the photographs themselves created a more suggestive photo spread than necessary. I already ruled that there was no constitutional infirmity, but that doesn't mean that a better job couldn't have been done selecting the photographs, and counsel are certainly free to argue that one way or another, and we've already had a lot of cross-examination on that. I don't think that that is a basis for expert testimony, because the issue that's been identified in this case was that the photographs themselves, I guess the features of the other five and the manner in which they were dressed and the background made the photograph of Mr. Smead stand out, and we don't need an expert to testify to that. So that's the basis of my ruling.

(J.A. 237.) Thus, the district judge believed Dr. Fulero's testimony was not "helpful" to the jury because the issue of how the lineup was presented to the witness had not been a basis for challenging the reliability of Morrow's identification. Instead, the defense had argued that the backgrounds of

12

the photographs and the appearances of the individuals in the other photographs in the lineup had made Morrow's identification unreliable. As a result, the district court ruled that Dr. Fulero would not be permitted to testify regarding lineup procedures. We conclude that the district court did not abuse its discretion because it properly "appl[ied] the correct law, follow[ed] the appropriate decision-making steps[,] and articulate[d] the bases upon which its decision rest[ed]." *Smithers*, 212 F.3d at 315.

This Court has noted that expert testimony regarding eyewitness identifications "inform[s] the jury of *why* the eyewitnesses' identifications were inherently unreliable" and, thus, provide a "scientific, professional perspective that no one else [can] offer[] to the jury." *Ferensic*, 501 F.3d at 477. The significance of an expert's testimony "cannot be overstated" because, without it, a jury has "no basis beyond defense counsel's word to suspect the inherent unreliability" of an eyewitness identification." *Id.* at 482. As a result, in *Smithers*, this Court held that the district court abused its discretion in precluding the defense from presenting the testimony of Dr. Fulero regarding the reliability of eyewitness identifications and factors that affect the reliability of an identification. *Smithers*, 212 F.3d at 314.

In *Smithers*, however, the district court excluded the entirety of Dr. Fulero's testimony regarding eyewitness identifications. *Id.* at 310. Further, the district court did not evaluate the content of the proffered testimony prior to excluding it, and offered no reason to support its decision to exclude the evidence.[7] *Id.* In contrast, before limiting the scope of Dr. Fulero's testimony, the

---

[7]The district judge did, however, note that it would be interesting to see what the jury would do without expert testimony since the government's case was based entirely on an eyewitness identification. *Smithers*, 212 F.3d at 310. He brushed aside the "defendant's fate" by telling counsel that they could always appeal or move for a new trial. *Id.* This Court found the district court's actions to be "gamesmanship at its worst." *Id.* While expressing its extreme disapproval of the judge's "experiment" rationale, this Court's

13

district court in this case conducted a hearing to assess the reliability and relevance of Dr. Fulero's testimony under Rule 702. The district judge did not preclude Dr. Fulero from testifying entirely but, instead, excluded only the portion of his testimony relating to lineup procedures that can increase the reliability of an eyewitness' identification.

Further, the jury in this case had a basis "beyond counsel's word" to suspect that Morrow's identification of Defendant from the photo-array lineup was unreliable or inaccurate. *See Ferensic*, 501 F.3d at 482. The jury heard substantial testimony regarding the reconstructive theory of memory and the possibility that post-event information, such as a photographic lineup, might have affected Morrow's original memory of the bank robbery. The jury also had a basis to doubt the accuracy of Morrow's identification based on Defendant's cross-examination of Morrow and DeKatch. Both witnesses admitted that Defendant's photograph would stand out for reasons unrelated to his involvement in the bank robbery. Although this Court has acknowledged that "'other means' of attacking eyewitness identifications do not effectively substitute for expert testimony on their inherent unreliability," *Ferensic*, 501 F.3d at 481, the testimony excluded in this case did not relate to the inherent unreliability of the identification. Instead, the testimony addressed the procedures, unrelated to "aspects of perception and memory . . . not within the common experience of most jurors," that law enforcement can follow to increase the reliability of an eyewitness identification. *Id.* at 482 (quoting *Smithers*, 212 F.3d at 315-16); *cf. United States v. Rodriguez-Felix*, 450 F.3d 1117, 1126 (10th Cir. 2007) (noting that the fundamental inquiry in determining whether expert testimony on the reliability of eyewitness identifications will "assist the trier of fact" is "whether

decision in *Smithers* was based on the district court's failure to conduct a *Daubert* hearing prior to excluding the testimony in full. *Id.* at 314.

such testimony fell outside the juror's common knowledge and experience" and finding that exclusion was not an abuse of discretion because "cross-examination amply exposed the common-sense deficiencies in the prosecution's identification case").[8]

Further, Defendant was not denied his Sixth Amendment right to present a complete defense.[9] "Exclusion of evidence only raises constitutional concerns if it has 'infringed upon a weighty interest of the accused.'" *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004) (quoting *Scheffer*, 523 U.S. at 308). Thus, "even where a district court erroneously excludes defense evidence, '[w]hether the exclusion of [an expert's] testimony violated [Defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Blackwell*, 459 F.3d at 753 (first and fourth alterations in original) (quoting *Washington v. Schriver*, 255 F.3d 45, 57 (2d Cir. 2001)).

Defendant argues that, because the government's case rested almost entirely on an eyewitness identification, the failure of the district court to allow Defendant to present all possible grounds to challenge the reliability of that identification denied him the right to present a *complete* defense. The exclusion of testimony related to lineup procedures, however, did not infringe a "weighty interest"

___

[8]Defendant also argues that the district court erred because it "focused on the possible effect Dr. Fulero's conclusions might have on the jury—not solely the principles and methodology underlying those conclusions." Pet'r Br. 36. While there are portions of the district judge's statements that could support this argument, the district judge made clear that the basis for excluding the evidence was that the testimony was not helpful to the jury because it was not closely related to the dispute over the photographic lineup, and because it would invade the jury's province as the judge of witness credibility. In addition, the district judge made these statements in addressing the relevance of the testimony, rather than its reliability.

[9]We also note that, although Defendant argues that *Ferensic* found reversible error even under the harmless error standard, the court in *Ferensic* emphasized that it was "particularly persuaded" by a jury note expressing an inability to reach a conclusion and asking to review the police report containing the sketches serving as the basis of the eyewitness' identification." *Ferensic*, 501 F.3d at 483. In reaching its conclusion, the court again "emphasize[d] just how significant the jury's note [was] to [its] analysis." *Id.*

15

of Defendant. *See Baze*, 371 F.3d at 324. While this Court in *Ferensic* concluded that exclusion of similar expert testimony infringed on a weighty interest of the accused, the trial court in that case excluded the entirety of the expert's testimony. *Ferensic*, 501 F.3d at 477 (agreeing that the court should not have precluded the expert from testifying and that, without the expert's testimony, "there was no evidence to support counsel's argument" that eyewitness identifications are inherently unreliable). Further, because the jury heard substantial testimony from Dr. Fulero regarding several potential problems with eyewitness identifications, and also heard cross-examination regarding the suggestiveness of the photo-array lineup, it is unlikely the additional testimony of Dr. Fulero regarding lineup procedures would create a "reasonable doubt that did not otherwise exist." *Blackwell*, 459 F.3d at 753. Thus, we conclude that the "exclusion of portions of [Dr. Fulero's] testimony was not an abuse of discretion, and accordingly, did not deny Defendant the right to present a [complete] defense." *Id.* As a result, the decision of the district court is **AFFIRMED**.