**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 16a0243n.06

Case No. 15-5885

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | May 06, 2016 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| AUGUST GIVENS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: GUY, BOGGS, and COOK, Circuit Judges.

BOGGS, Circuit Judge. On a May evening in 2014, an officer of the Memphis Police Department ("MPD") approached an occupied SUV parked in a downtown Memphis neighborhood. After smelling marijuana, the officer ordered the occupants out of the vehicle. MPD officers discovered four firearms in the vehicle and detained the driver, August Givens, who admitted that he carried guns for protection. Officers then took Givens to a Memphis police station, where he confessed to having acquired and possessed three of the firearms discovered in the vehicle. A federal grand jury subsequently indicted Givens on two counts of violating 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms. Givens was tried before a jury, which heard evidence of his inculpatory statements and convicted him on both counts. On appeal, Givens argues that the district court should have suppressed the statements he made

to police. He also argues that the district court committed reversible error when it prevented his mother from testifying in his defense. For the reasons given below, we affirm.

I

A

On May 15, 2014, two brothers, Cedric and Travis Covington, attended a family gathering in a Memphis suburb with their cousin, Lederrick Tate. Cedric decided to phone August Givens, whom the three men have known since childhood, to invite him along. Givens wanted to join, but with his own car disabled, he had no easy way to travel from his parents' house to the party. Without asking permission, Givens took the spare keys to an SUV that belonged to his mother, Jean, and drove Jean's car to meet the Covington brothers and Tate.

At some point in the evening, the men left the gathering and sat in Jean's vehicle, where they shared two marijuana blunts. They then drove to the Chunky Monkey, a downtown Memphis pub where Givens was a regular. Givens parked the SUV outside the Chunky Monkey and went inside to see the owner. After learning that the pub was about to close, Givens returned to his vehicle. He sat in the driver's seat of the parked car, pulled out his cell phone, and chatted with some friends on Facebook while Travis and Tate dozed in the back seat. Cedric relaxed in the front passenger seat.

Meanwhile, MPD Officer Booker Holloway, an on-duty officer patrolling downtown Memphis, noticed the parked SUV as he drove by the Chunky Monkey. The officer simply drove past the vehicle, thinking little of it. But when Holloway passed the block again a few minutes later, he saw that the vehicle and its occupants had not moved. In Officer Holloway's experience, it was not uncommon for individuals to drive to that neighborhood, wait in their vehicles, and, when the coast was clear, break into parked cars. Curious to know what Givens

2

and his friends were up to, Holloway got out of his vehicle and began walking over to the parked SUV. When he began to smell marijuana, Holloway called for backup. Holloway then approached the front driver's-side door, where Givens was sitting. Holloway asked Givens if he had any marijuana in the vehicle, which Givens answered by passing the officer an empty plastic baggie.

Officer Holloway then asked Givens to step out of the vehicle. As Givens stepped out, Holloway saw a revolver sitting "just in front of the [front] seats right by the center console . . . beside the driver." Holloway's fellow officers arrived on the scene and pulled Cedric from the front passenger seat, where officers found a loaded pistol located near the console on the passenger side. Upon opening the back hatch of the vehicle, officers also found an assault rifle along with seventeen rounds of ammunition. After removing Travis and Tate from the back seat, officers discovered a fourth weapon, a loaded semiautomatic handgun that was tucked into the back seat where Travis had been sitting.

While the other officers searched the SUV, MPD Officer Brian Falatko patted Givens down. After finding drugs on Givens's person, Falatko handcuffed him and placed him in the back seat of a police cruiser. At that point, and before informing Givens of his Fifth Amendment rights, Falatko asked Givens if he was a convicted felon. Givens responded that he did have felony convictions and that he carried firearms for protection.

Givens was then transported to a police station, where he met with MPD Sergeant Marcus Frierson. Frierson asked Givens some preliminary biographical questions before informing him of his Fifth Amendment rights, in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966). Givens then initialed, signed, and dated an advice-of-rights form, which indicated that he understood and waived his rights. He proceeded to tell Sergeant Frierson that he had

3

purchased all of the firearms that police uncovered in his vehicle except for the semiautomatic handgun that was recovered from Travis's seat. Givens also repeated his earlier statement that he carried guns for protection. Frierson typed and printed the statement, which Givens signed.

B

In October 2014, a federal grand jury returned a two-count indictment charging Givens with two violations of 18 U.S.C. § 922(g)(1), which prohibits anyone who has been convicted of a "crime punishable by imprisonment for a term exceeding one year" from possessing firearms. Givens filed a pretrial motion to suppress the inculpatory statements that he made to police, arguing that these statements were the product of violence and threats made by Officer Falatko. However, Givens's counsel subsequently withdrew the motion in anticipation that Givens would enter a guilty plea.

Givens apparently changed his mind and opted to have his case tried before a jury. In response, the United States filed a motion in limine seeking to exclude any evidence or argument concerning the "alleged use of force and police brutality during the defendant's arrest," arguing that such evidence would be irrelevant to Givens's guilt or innocence. Givens opposed the motion, reasoning that evidence of police brutality was relevant to explaining why he "would admit to a crime he did not commit." Givens also filed his own motion in limine renewing his motion to suppress.

At a hearing on both motions in limine, Givens's counsel maintained that evidence of police brutality was highly relevant, explaining that "the theory of [our] case is that [Givens] made a false confession based upon some violence that took place during the arrest." Counsel added that it is "our position . . . that if I'm permitted to get into these things and talk about them, meaning the brutality or the violence, then I don't plan on going forward with th[e] motion [to

4

suppress]." The district court then denied the government's motion, allowing Givens's counsel to inquire into whether officers hit or threatened Givens if the government elicited Givens's statements on direct examination of the officers. The court also clarified that Givens would be allowed to present evidence of police violence as part of his own case. After consulting with Givens, counsel then withdrew Givens's own motion in limine, opting to challenge the voluntariness of his statements before the jury.

At trial, the government introduced the testimony of MPD Officers Holloway, Falatko, and Christopher Winsett, as well as Sergeant Frierson. Officers Holloway and Winsett testified that they recovered four weapons from the SUV that Givens had been driving. Officers Falatko and Winsett also testified that Officer Falatko had asked Givens about his criminal history after detaining him, which prompted Givens to respond that he was a convicted felon and carried guns for protection. All three officers denied that Falatko struck Givens.

Sergeant Frierson, who questioned Givens at the police station, testified that after he informed Givens of his rights, Givens signed a written waiver and gave an oral statement in which he admitted to possessing three of the four firearms. Frierson recounted that he typed the statement verbatim, after which Givens signed a printed copy. The government then called Cedric and Tate, both of whom denied owning any of the weapons found in Jean's SUV, and Travis, who admitted to possessing the semiautomatic handgun that was found tucked into the back seat. The government also played a taped prison phone conversation between Givens and a friend, in which Givens stated that officers had found three firearms on him.

Givens took the stand in his own defense, denied that he had had any knowledge of the weapons in his mother's vehicle, and explained that his statements to Officer Falatko and Sergeant Frierson were coerced. Givens testified that after removing him from the SUV and

patting him down, Officer Falatko left him in a police cruiser, where he watched as officers removed and photographed the weapons from the SUV. Givens still had his cell phone in his pocket and managed to dial his mother's number in order to explain to her what he had done with her car. According to Givens, Officer Falatko noticed that Givens was talking on the phone, opened the car door, and hit Givens in the neck with an elbow, causing him to cry out. Falatko then threatened to spray mace at Givens, who reportedly agreed to say "whatever [Falakto] wanted" because he "didn't want to get beat up [any] more."

Givens testified that, later that night, another officer drove Givens to a Memphis police station, where he signed a waiver of rights in order to obtain medical care because officers "w[eren]'t doing [any]thing for [him] until" he signed the waiver. Givens alleged that he told his interrogator, Sergeant Frierson, that he had no prior knowledge of the firearms, that an officer had attacked him, and that officers "told [him] they were going to make [him] take all these charges." Nevertheless, Sergeant Frierson typed up a statement tying Givens to three of the firearms, which Givens explained he signed simply because he wanted to end the interrogation and seek medical attention.

Givens also called Felicia Matthews, a police-station employee responsible for patient health records. Matthews testified that after Givens was arrested and questioned, he informed prison medical staff that he had been hit in the neck during his arrest and was experiencing pain in his neck and numbness in his left hand. Doctors conducted x-ray scans of Givens's body, and a nurse gave Givens a ten-day supply of ibuprofen for the pain.

Before taking the stand himself, Givens sought to have his mother testify about what she heard on the phone call, which would corroborate Givens's claim that he was hit in the neck by Officer Falatko. With the jury excused, Jean explained to the court that she picked up her son's

phone call and heard "somebody hitting on [her son], he was hollering for me to help him, I couldn't help him, but I heard them hitting him, hitting him and hitting him." When pressed on exactly what she had heard, Jean elaborated that "[i]t sound[ed] like somebody hit somebody with a stick."

The government objected to Jean's testimony on the ground that she lacked firsthand knowledge of what transpired in the police car. Givens countered that Jean would simply "testify to her perceptions and . . . she could be a fact witness based on that." The district court postponed its decision until after Givens testified, and ultimately ruled that Jean could not testify because her testimony would have conveyed hearsay to the jury, and in any case was "unreliable, speculative, and [of] very little relevance, and that relevance would be highly outweighed by the prejudic[ial] effect." The court then submitted the case to the jury, which found Givens guilty on both counts. The district court sentenced Givens to a total term of one hundred months in prison.

Givens timely filed a notice of appeal. On appeal, Givens argues that the district court should have suppressed his inculpatory statements. He also argues that this court should overturn his convictions because the district court erred by prohibiting Jean from testifying that she heard sounds of someone beating him. We address each argument in turn.

II

Givens argues that the admission of his statement that he kept weapons for protection violated the rule of *Miranda* because the statement was the product of an unwarned custodial interrogation. He also argues that the district court should have suppressed his police-station confession to Sergeant Frierson because that statement was influenced by Falatko's brutality, and in any event was tainted by Givens's first unwarned confession at the scene. We may not reverse

on the basis of Fifth Amendment error because Givens knowingly and voluntarily waived these arguments when he withdrew his motion to suppress the statements he now attacks on appeal.

We have held that "[a]n attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course." *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002) (alteration in original) (quoting *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990)). As Givens's counsel conceded at oral argument before this court, we have enforced this common-sense rule by considering arguments to be waived where a defendant makes and subsequently withdraws a relevant pretrial motion in the district court. *See, e.g.*, *United States v. Washington*, 271 F. App'x 485, 490 (6th Cir. 2008).

In *United States v. Sheppard*, 149 F.3d 458 (6th Cir. 1998), for example, we asked whether we could review a suppression argument that the defendant had raised in the district court but later abandoned. *Id.* at 461. We held that because the defendant had withdrawn a motion to suppress in the district court, he knowingly and voluntarily waived any Fifth Amendment error, thereby depriving this court of authority to consider the matter at all. *Id.* at 461 & n.3. We see no reason for why a different result should obtain here, where Givens made and subsequently withdrew a motion to suppress that contained exactly the same suppression arguments that he seeks to make on appeal. Because "waiver extinguishes the ability to challenge a[n] error," we may not now consider those abandoned arguments. *United States v. Noble*, 762 F.3d 509, 528 (6th Cir. 2014); *see also United States v. Olano*, 507 U.S. 725, 733 (1993) (distinguishing waiver from forfeiture); *United States v. Soto*, 794 F.3d 635, 648–50, 654–55 (6th Cir. 2015) (same).

Givens counters that he could not have knowingly waived his suppression arguments because the fact that "police had questioned Mr. Givens at the scene without properly

8

*Mirandizing* him" only came to light at trial. The record belies Givens's contention. In his original motion to suppress, Givens advised the court that "[t]he government contends that Mr. Givens made statements of admission at the scene of the arrest" without the benefit of a *Miranda* warning. Givens's arrest record, which he attached as an exhibit to that motion, recounted that "Officer Falatko spoke with defendant August Givens about his criminal history . . . [and] Givens stated . . . [']I keep guns on me for protection.'" Givens also acknowledged in his subsequent motion in limine that he had made unwarned statements "while handcuffed and in the back seat of a police vehicle." And if there were any lingering doubt, in the pretrial hearing concerning the parties' motions in limine, the prosecutor explicitly drew the court's attention to the fact that Givens told officers, "I keep guns for protection."

In short, Givens's two district-court motions present the same suppression arguments that he makes on appeal. Because Givens's counsel—after consulting with Givens—withdrew these motions and agreed that the government could introduce Givens's inculpatory statements into evidence, any Fifth Amendment error related to their admission is extinguished, and appellate review is no longer available. *See Aparco-Centeno*, 280 F.3d at 1088; *Sheppard*, 149 F.3d at 461 & n.3.

III

Givens next argues that this court should reverse his convictions because the district court erred when it prevented his mother from testifying that she heard officers beating her son, which Givens offered to corroborate his claim that his confession was unreliable. He submits that none of the district court's grounds for refusing to admit Jean's testimony—namely, that Jean lacked firsthand knowledge, would give hearsay testimony, and that the testimony would be far more prejudicial than probative—are correct. Though we harbor doubts about the correctness of the

9

district court's ruling, Givens has failed to show that any error in excluding this evidence requires reversal in this case.

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Lloyd*, 462 F.3d 510, 516 (6th Cir. 2006). We agree with Givens that, despite the deferential nature of our review, the district court's explanations for its ruling are questionable. Jean had firsthand knowledge of the sounds that she claims to have heard over the phone, and we doubt whether those "hitting" sounds were assertive in nature, as they must be in order to come within the definition of hearsay in Federal Rule of Evidence 801. *See* Fed. R. Evid. 801(a), (c). Though Givens's cry for help certainly may have been assertive in context, *see In re Air Crash Disaster*, 86 F.3d 498, 536 (6th Cir. 1996), some hearsay statements are admissible in federal courts, including those relating to a "startling event or condition" or those describing a then-existing physical condition such as pain, Fed. R. Evid. 803(2)–(3); *see also United States v. Taylor*, Nos. 92-1875, 92-1911, 1993 WL 94319, at *3 (6th Cir. Mar. 29, 1993) (per curiam). What is more, though Jean's proffer that her son stated "Momma, help me" might have unduly prejudiced the government, *see* Fed. R. Evid. 403, we see no reason why the district court could not have limited the scope of Jean's testimony to the "hitting" sounds that she heard.

But we need not decide whether the district court abused its discretion because any error, to the extent that it existed, was harmless. "[A]n error by a district court with respect to the admission of evidence is subject to harmless error analysis, and it is well settled that an error which is not of a constitutional dimension is harmless 'unless it is more probable than not that the error materially affected the verdict.'" *United States v. Daniel*, 134 F.3d 1259, 1262 (6th Cir. 1998) (quoting *United States v. Fountain*, 2 F.3d 656, 668 (6th Cir. 1993)). Under the

10

circumstances of this case, we are satisfied that the exclusion of Jean's testimony had no impact on the jury's verdict.

It is true that Jean's proffered testimony could have lent support for Givens's claim that he was hit by Officer Falatko. But we cannot ignore the reality that her testimony was inconsistent with Givens's own on an important point; Jean testified that she heard multiple "hitting" noises, whereas Givens mentioned that he had been hit only once. In light of this reality, it is likely that the probative value of Jean's testimony would have been slight. Because this inconsistency could have cast doubt upon Givens's credibility, it is even possible that it could have led a trier of fact to question whether Givens was hit at all. Moreover, as Givens himself admits on appeal, "[a]nyone who has had a conversation on a cell phone knows how distorted extraneous noises can sound while listening to the other person on the other end [o]f the call," indicating that even if Jean's testimony were to have been consistent with her son's, it would have had little value.

More importantly, Jean's testimony would have done nothing to controvert the evidence that Givens's confession was reliable irrespective of what happened in the police cruiser. The government introduced plenty of evidence that directly or circumstantially linked Givens to three of the weapons in the SUV he was driving. Cedric and Tate both denied owning any of the weapons, and Travis admitted to possessing the one handgun that Givens told officers did not belong to him. While Givens did take the stand to explain that his confession was false and that the three other firearms were not actually his, the government cast doubt upon his explanation when it introduced a recorded conversation in which Givens told a friend that officers had found three guns on him. Because it is quite doubtful that Jean's testimony would have added anything to Givens's case, and because the government presented ample evidence that Givens did in fact

11

purchase and possess three of the firearms in his vehicle, any error in preventing Jean from testifying was harmless.

Givens protests that the district court's exclusion of Jean's testimony was not just a misapplication of the Federal Rules of Evidence, but also amounted to constitutional error because it deprived him of the ability to present a complete defense. As Givens correctly points out, the federal Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). We have recognized that the opportunity to offer witness testimony is "[a] central component" of this Sixth Amendment right. *United States v. Smead*, 317 F. App'x 457, 462 (6th Cir. 2008).

But that right is not without limit; we have recognized that the "'well-established rules of evidence [that] permit trial judges to exclude evidence' under certain circumstances are unlikely to violate" the Constitution. *Id.* at 463 (alteration in original) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006)). Even where a district court erroneously applies those evidentiary rules and excludes admissible evidence, a defendant's right to present a complete defense is not infringed so long as the improperly excluded evidence "would [not] have created a reasonable doubt as to [the] [d]efendant's guilt." *United States v. Blackwell*, 459 F.3d 739, 757 (6th Cir. 2006). We hold that Jean's testimony would not have created such a doubt.

Givens sought to introduce Jean's testimony to corroborate his claim of police brutality. As we have already explained, Jean's testimony had little probative value because it was inconsistent with her son's account of what transpired in the police cruiser. In the context of the ample evidence that supported not only Givens's guilt but also the reliability of his confession, any evidentiary error did not deny Givens the opportunity to present a complete defense.

IV

Under the circumstances of this case, Givens's decision to attack the reliability of his confession before the jury instead of before the court forecloses our review of his withdrawn suppression arguments.  Because any error in denying Givens the opportunity to call his mother as a witness was harmless, we may not reverse on evidentiary grounds either.  Finally, because we find that the excluded witness testimony would not have created a reasonable doubt as to Givens's guilt, we find no violation of Givens's Sixth Amendment right to present a defense. For these reasons, the judgment of the district court is AFFIRMED.